**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230082-U

Order filed March 14, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | |
|---|---|
| FERRELL DASTE, as Executor of the Estate of JOHN S. WOLD, Deceased and THOMAS G. WOLD, Individually and as Trustees of the Children's Trust,<br><br>   Plaintiffs-Appellees,<br><br>  v.<br><br>ERROL S. DORIS, SR., Individually and as Co-Trustee of the E. Thomas Wold Declaration Of Trust,<br><br>   Defendant-Appellant,<br><br>And<br><br>JAMES WOLD,<br><br>   Beneficiary-Appellee. | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois,<br><br>Appeal No. 3-23-0082<br>Circuit No. 20-CH-361<br><br><br><br><br><br><br><br><br><br>Honorable<br>Bonnie M. Wheaton,<br>Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices Peterson and Albrecht concurred in the judgment.

**ORDER**

¶ 1  *Held*: The trial court erred when, following a motion for summary judgment for an accounting, it held the trustee personally liable for a $250,000 distribution to the

Trust's beneficiary and for $73,187 in attorney fees paid for out of the Trust, at least some of which were incurred in the closing of the estate and the proper administration of the Trust as opposed to in defense of the trustee's alleged malfeasance. The trial court did not err in ordering the trustee to repay $174,000 in Trust funds that the trustee had paid to himself (and then to his company) in partial satisfaction of a personal loan from the trustee to the beneficiary, nor in ordering the trustee to repay $62,600 in Trust funds that the trustee had paid to his company as an alleged Trust investment. We remand for further proceedings on the $250,000 and $73,187 transactions as well as the question of trustee fees. Affirmed in part, reversed in part, and remanded.

¶ 2        This case concerns appellant-defendant's, Errol Doris's, actions as co-trustee of the E. Thomas Wold Irrevocable Trust (the Trust). Following the death of the co-trustee and beneficiary of the Trust, Lola M. Parton Wold (E. Thomas's second wife of more than 30 years), Doris was to wind-up the Trust and disperse the funds to the respective trusts of plaintiffs, Thomas Wold, John Wold, and James Wold (E. Thomas's three adult children born of his first marriage).[1] During the wind-up period, Doris disclosed to plaintiffs certain actions he had taken as trustee that prompted them to file a four-count complaint in chancery court against him, including an action for accounting and breach of fiduciary duty. Following a motion for summary judgment, the trial court entered a $575,000 money judgment against Doris personally, representing the total amount of the objected-to transactions. We have jurisdiction over Doris's appeal pursuant to Illinois Supreme Court Rule 304(b)(1) (eff. March 8, 2016) (judgments entered in the administration of an estate, guardianship, or similar proceeding that finally determines the rights or status of a party are immediately appealable without a special finding). See *In re Estate of Lee*, 2017 IL App (3d)

---

[1] John Wold passed away when the current action was pending. John's personal representative, Ferrell Daste, was substituted as co-plaintiff. Also, initially, James Wold was not a party to the complaint. However, Thomas and John named him as a beneficiary in the caption of their complaint. One month later, James filed a pleading that he titled a counterclaim, the substance of which was identical to Thomas and John's complaint. Moving forward, the parties agree that all three adult children and/or their personal representatives should be referred to as "plaintiffs."

2

150651, ¶ 23 (relying on Rule 304(b)(1) to provide jurisdiction to review, *inter alia*, the trial court's order to provide a trust accounting and a trust distribution). For the reasons that follow, we reverse in part, holding that plaintiffs did not establish as a matter of law that certain of the challenged transactions—distributions to the Trust's beneficiary and for payment of attorney fees—constituted self-dealing so as to shift the burden of proof to Doris to show that those transactions were fair, made in good faith, and/or permitted by the terms of the Trust. However, we affirm the trial court's order that Doris be held personally liable and essentially repay Trust funds distributed to Doris himself (and then to his company) in partial repayment of a personal loan and additional Trust funds distributed to Doris's company as an alleged investment. We remand for further proceedings on the first two transactions. We also remand for the trial court to address trustee fees to determine whether, in light of our partial reversal, Doris is entitled to *any* trustee fees. Affirmed in part, reversed in part, and remanded.

¶ 3                                  I. BACKGROUND

¶ 4        On December 27, 2015, E. Thomas Wold passed away. Doris and Lola served as co-executors of the estate, which went through probate in the circuit court of Cook County. On October 19, 2017, the probate court discharged the co-executors, and the residue of the estate was distributed to the Trust. Paragraph 12, section 11 of the Trust provided that, following E. Thomas's death, Lola and Doris would succeed him as co-trustees. Other relevant provisions of the Trust were as follows.

¶ 5        Paragraph 6, sections 2A and 3A provided that the Trust's income was payable to Lola. Further, the trustee could distribute to Lola "such sums from [the] principal as [he] deems advisable from time to time for her health and support and maintenance in reasonable comfort, considering

3

her needs, income, and other means of support from all sources known to the trustee, and any other circumstances or factors that the trustee deems pertinent."

¶ 6 Paragraph 12, section 6 addresses certain trustee powers. It provides that the trustee has the power to manage, invest, or sell trust property. Paragraph 12, section 7 "expressly authorizes" the trustee to retain or acquire as a Trust investment any interest in the "family business interests" such as, *inter alia*, Belcom North America, LLC, or any subsidiary of the same.

¶ 7 Paragraph 12, section 11 addresses conflicts of interest. It provides that co-trustees shall have jointly all the powers given to the trustee, except that no trustee shall have or participate in the exercise of any discretion to determine the propriety or amount of payments or distributions of income or principal to himself or herself or to any person to whom he or she is legally obligated.

¶ 8 Paragraph 12, section 8 provides that the trustee is entitled to reasonable compensation. It also addresses the trustee's duty to account and exonerates the trustee from liability. As to accounting, it provides that the trustee shall render an account of its receipts and disbursements and a statement of assets at least annually "to each adult beneficiary then entitled to receive or have the benefit of income from the trust." As to exoneration, it provides that "no individual trustee shall be liable for any loss or damage incurred by any trust or beneficiary, unless such loss or damage occurs or is caused by willful default, willful misconduct, or gross negligence of that trustee."

¶ 9 The Trust's major assets were interests in two separate trusts, Norfolk Realty Trust (Norfolk) and Eustice, LLC, each of which were real estate investment trusts. The Trust was merely a partial owner in both Norfolk and Eustice. As is relevant here, Norfolk's major asset was a commercial real estate property. The Trust's interest in Norfolk was valued at approximately

$445,000. The Trust's interest in Eustice was estimated to be between $1.3 and $1.7 million at different points in the case.

¶ 10     On April 7, 2020, plaintiffs filed a four-count complaint against Doris, including: (1) an action for accounting; (2) breach of fiduciary duty; (3) removal of trustee; and (4) tortious interference with expectancy. As to Count I, an action for accounting, plaintiffs alleged that Lola received income distributions from the trust between the close of the estate (October 19, 2017) and her death (June 10, 2019). When Lola died, mindful that the assets of the Trust were to be distributed in equal shares to the three Children's Trusts, John Wold sought information from Doris regarding the status of the Trust and its assets. On September 25, 2019, John and Doris met with counsel for each trust present. At this meeting, Doris stated that the Trust had paid approximately $62,000 over his term as trustee as investments to Doris's companies (later identified as, *inter alia*, Belcom).[2] Doris also stated that he liquidated the Trust's $445,000 interest in Norfolk. Doris continued that, from the liquidation, he distributed approximately $250,000 to Lola for health expenses and $174,000 to himself (and later to Belcom), representing a partial repayment of a 2004, $750,000 personal loan that he had made to E. Thomas and/or Lola.[3]

¶ 11     Plaintiffs alleged that, "as the remainder beneficiaries of the Trust, [we] are entitled to the accounting [of the Trust] from [Doris] as Trustee." They sought: (1) an accounting from October 19, 2017, to the present; (2) all documentation pertaining to the accounting, especially those

---

[2] The record reflects that a portion of this $62,000 consisted of payments to another one of Doris's companies, A Choice For Life. It is not clear from the record whether A Choice For Life is a subsidiary of Belcom. However, as it does not impact our analysis, we refer to the payments to Doris's companies as payments to Belcom.

[3] Plaintiffs did not set forth these exact figures in the complaint; rather they were set forth in subsequent pleadings.

documents necessary to support the aforementioned payments, *i.e.*, the $62,000 to Belcom, the $250,000 to Lola, and the $174,000 to Doris (and later to Belcom); and (3) *leave to file objections to such accounting and for judgment against Doris in the amount of any deficiencies the court may find*.

¶ 12        As to Count II, breach of fiduciary duty, plaintiffs alleged that Doris breached his fiduciary duty to carry out the trust according to its terms and instead acted in his own interest. Specifically, they argued that Doris breached his fiduciary duty when he: (1) transferred $250,000 to Lola without verification as to Lola's need for these funds; (2) transferred approximately $174,000 to himself and/or his company; and (3) transferred approximately $62,000 to Belcom. They further argued that, in taking these actions, Doris: (1) failed to "take into account the interests of the remainder beneficiaries of the Trust"; and (2) failed to keep adequate records to support his administration of the Trust. They continued that, as a result of these breaches, the Trust was depleted of over $500,000 in principal assets that would have otherwise passed to the remainder beneficiaries. They sought: (1) a finding that Doris breached his fiduciary duties to the Trust and the beneficiaries thereof; and (2) to assess against Doris personally the damages caused to them in an amount in excess of $500,000 or such other sum that this court finds as a result of the breach.

¶ 13        As to Count III, removal of trustee, plaintiffs alleged that Doris's failure to account and breach of fiduciary duty rendered him unqualified to continue to act as trustee. They sought: (1) to remove Doris as Trustee; and (2) an order that the residuary assets of the Trust be distributed to E. Thomas's three adult children as the trustees of their respective Children's Trusts.

¶ 14        As to Count IV, tortious interference with expectancy, plaintiffs alleged that Doris intentionally sought to interfere with and exhaust their interests in the Trust by "conspiring" with Lola or Lola's agent to liquidate the Norfolk asset such that Doris would be paid $174,000 for his

6

personal gain in exchange for agreeing to pay $250,000 to Lola. On November 18, 2020, the trial court dismissed Count IV.

¶ 15 The case proceeded primarily along Count I, an action for accounting. We detail motions pertaining to Count I, referring to other motions as necessary. On March 10, 2021, plaintiffs moved for summary judgment on Count I. Plaintiffs argued that, as a matter of law, they were entitled to an accounting. 760 ILCS 3/813.2(b), (c) (West 2020) (requiring that an accounting under the Act contain an inventory of the trust estate, and the receipts, disbursements, and distributions). They further urged that they were entitled to such supporting information as was reasonably necessary to enable them to enforce their rights under the Trust or to redress a breach of fiduciary duty. *Wallace v. Moody*, 4 Ill. 2d 86, 95 (1954). Plaintiffs attached, *inter alia*, email correspondence between the attorneys representing the Trust and the Children's Trust, respectively the Harrison Held law firm and the Charles Kogut law firm. In an August 5, 2019, email, Kogut questioned Doris's liquidation of the Norfolk Trust and disbursement to Lola, asserting that she was entitled only to income from the Trust. Kogut also expressed concern that Doris and Lola together had allegedly authorized Eustice to liquidate the Trusts interest in that company, for $1.72 million (though said liquidation never occurred). On December 29, 2019, Kogut questioned attorney fees that had been charged to the Trust: "I am concerned that the trust may be paying attorneys' fees for Errol's malfeasance as a trustee. Any fees paid that are later determined to be for Errol's personal benefit will obviously need to be reimbursed to the trust. Therefore, I cannot agree that *all* the [attorney] fees paid by Errol from the trust are appropriate." (Emphasis added.) On May 6, 2020, Kogut asked Harrison Held about a November 19, 2019, $33,000 disbursement from Eustice to the Trust. Harrison Held responded that Doris used the Eustice disbursement to pay $18,000 to Harrison Held for outstanding attorney fees and $15,000 to himself for a trustee

7

fee.  Harrison Held had also mentioned the $15,000 fee in an earlier email, noting that this was the only fee Doris had taken in four years.

¶ 16    On March 21, 2021, Harrison Held moved to withdraw.  It explained that it had performed necessary legal work on behalf of the Trust, but that the illiquidity of the Trust assets, specifically Eustice, left the Trust with no means to pay Harrison Held.  (Previously, Doris, through Harrison Held, had sought to enjoin plaintiffs from taking control of the Eustice asset and its income prior to the wind-up of the Trust.  Harrison Held alleged that this income had been necessary to its payment.)

¶ 17    On April 5, 2021, the trial court granted Harrison Held's motion to withdraw.  On May 3, 2021, the trial court ordered that the Eustice funds be released in equal shares to the Children's Trusts.

¶ 18    On July 14, 2021, the trial court entered an order purporting to "grant" plaintiffs' motion for summary judgment on Count I.  However, the court's order addressed only the first component of plaintiffs' requested relief for Count I—ordering Doris to provide an accounting.  The court did not address plaintiffs' ultimate requested relief for Count I: "leave to file objections to such accounting and for judgment against Doris in the amount of any deficiencies the court may find."

¶ 19    On July 6, 2021, and again on August 26, 2021, Doris, acting as a self-represented litigant, filed a series of responsive pleadings totaling nearly 500 pages.  In these, he explained his theory of the case.  He indicated he had difficulty generating a completely current statement of accounting, because, upon Lola's death, plaintiffs instructed Eustice's manager to freeze accounts.  This impeded Doris's access to information and, without further Eustice income distributions, he could not pay outstanding attorney fees.  Prior to Lola's death, Lola, as co-trustee, had been the person to interact with the banks.  Upon Lola's passing, the banks, initially, would not work with

8

Doris. (These allegations concerning the freezing of Eustice funds and the banks' recalcitrance are at least partially supported by petitions for attorney fees in the record and by correspondence between the attorneys).

¶ 20    Additionally, Doris explained his decision to liquidate the Trust's interest in the Norfolk asset. The building held by Norfolk incurred expensive repairs, was not able to retain rent-paying tenants, and was not generating income as expected. Doris reviewed an appraisal of the property before agreeing that the Trust's interests were worth $445,000. Doris included email correspondence from the manager of the Norfolk asset supporting these assertions. Lola, entering her later years, had expected greater income from the Norfolk asset to pay for rising health care costs. (A subsequently filed pleading included an email from Lola's son and power of attorney, Richard D. Parton, noting the same). As to the $62,000 total investments in Belcom, Doris explained that this was an ongoing investment, authorized by the Trust, and that plaintiffs could elect to remain invested or liquidate their interests at a later date. Doris asserted that, as a result of the investments, the Trust owned a 6% interest in Belcom.

¶ 21    Doris attached numerous documents, including a 2018, signed, notarized acknowledgment of $750,000 in personal debt owed to Doris by E. Thomas and/or Lola. Lola signed the acknowledgment referencing her title as co-trustee. Also attached were three, 2004 promissory notes reflecting a total of $750,000 in personal loans from Doris to E. Thomas and/or Lola, and a 2016, informal letter from Lola to Doris discussing the debt.

¶ 22    On November 10, 2021, the trial court determined that the mass volume of pleadings Doris had filed on August 26, 2021, could not stand as an accounting. On December 14, 2021, Doris filed an accounting, consisting only of a 10-page bookkeeping document that contained an

9

inventory of the trust estate, and the receipts, disbursements, and distributions. A substantially similar document had been included as part of Doris's August 26, 2021, pleadings.

¶ 23    On January 11, 2022, plaintiffs filed an objection to Doris's accounting. Specifically, they objected to the following five transactions: (1) a March 21, 2019, $250,000 disbursement to Lola; (2) $73,187 in attorney fees; (3) a March 21, 2019, $174,000 to Doris (and later to Belcom, in alleged repayment for a personal loan from Doris to E. Thomas and Lola); (4) $62,000 to Belcom as an investment; and (5) a November 25, 2019, $15,000 trustee fee to Doris. To clarify, plaintiffs did not argue that it was a breach of duty or even poor judgment to liquidate the Norfolk asset, but that Doris's use of the liquidated funds—$250,000 to Lola and $174,000 to Doris—was wrongful.

¶ 24    As to the $250,000 disbursement to Lola, plaintiffs argued that, "any distributions of principal from the Trust [to Lola] were limited to an identifiable standard for Lola's 'health and support and maintenance in reasonable comfort, considering her needs, income and other means of support from all sources known to the trustee and any other circumstances or factors that the trustee deems pertinent.' " Plaintiffs asserted that, "[a]lthough repeatedly requested from Doris, no explanation has ever been provided by Doris to justify the principal distribution of $250,000.00 to Lola."

¶ 25    As to the $73,187 in payment to attorney fees, plaintiffs identified 12 different payments to 3 different firms made between July 25, 2017, and January 7, 2020. Plaintiffs noted that the final accounting for the estate was entered on July 1, 2017, and "[i]t is difficult to see from the accounting how the Trust could incur legal expenses totaling $73,187." Plaintiffs asserted that the court previously denied Harrison Held's petition for *additional* attorney fees on the basis that the fees were incurred defending Doris's malfeasance as Trustee.

¶ 26     As to the $174,000 disbursement to Belcom, plaintiffs argued: "Doris identifies this payment on his Index as 'Partial Loan Reimbursements to Beltech (Errol Doris).' No explanation, proof or other justification had been provided by Doris to support the propriety of this self-serving payment to Doris."

¶ 27     As to the $62,000 disbursements to Belcom, plaintiffs identified 8 different disbursements made between July 25, 2017, and March 21, 2019. Plaintiffs argued: "Doris claims that $62,600 of Trust funds were 'invested' in [Belcom]. No proof or evidence that any such 'investment' was legitimately made in [Belcom]."

¶ 28     Finally, as to the $15,000 trustee fee, plaintiffs argued in total: "Doris explains [the trustee fee] on his Index as 'Co-Trustee (Errol Doris) Fees.' Based on the alleged malfeasance of Doris's handling in this matter, objection is made to *any* fees to Doris." (Emphasis added.)

¶ 29     As a remedy, plaintiffs requested personal judgment against Doris in the amount of the objected-to disbursements, assuming the court "disapproved" the disbursements. Plaintiffs did not cite any statutory or common law authority anywhere in its motion or request for relief.

¶ 30     On October 11, 2022, following several extensions of time, Doris filed a response to plaintiffs' objections. Doris typed his responses to plaintiffs' objections in red font to the side of each of plaintiffs' allegations on a photocopy of plaintiffs' motion. He attached several hundred pages of documents, including: (1) the August 26, 2021, filing, explaining his theory of the case (but not containing the same attachments, such as Lola's acknowledgement of the $750,000 loan); (2) attorney fee invoices and email correspondence between the parties' respective attorneys discussing unpaid attorney fees; (3) numerous documents and email correspondence concerning the Norfolk asset (which, if credited, supported Doris's position that the real estate held by Norfolk was expensive to maintain, failed to produce income as anticipated, and was worth the amount

11

received upon liquidation of the Trust's interest in the Norfolk asset); (4) email correspondence between himself and Lola's son, Richard Parton (which, if credited, supported Doris's position that, in his business judgment, the Norfolk asset was not producing the income to Lola envisioned by E. Thomas, and that Lola needed additional funds to pay health-related expenses); and (5) pictures of Lola appearing to be in a poor state of health and in a medical facility.

¶ 31        On November 30, 2022, the trial court conducted a summary judgment hearing on Doris's accounting and plaintiffs' objections thereto. It entered the following written order:

> "This matter coming before the Court for hearing on Errol Doris' accounting as Trustee of the E. Thomas Wold Trust and the objections filed thereto filed by [the Wold descendants], and the Court finding that Doris' accounting is insufficient and lacks any details to overcome the objections filed against his accounting, and Doris not providing any other evidence to support his accounting, and the Court being fully advised in the premises,

> IT IS ORDERED AS FOLLOWS:

> 1. Judgment is hereby entered against Errol Doris, individually, in the amount of $575,000.00 (Five Hundred Seventy Five Thousand Dollars) and in favor of Ferrell Daste, Trustee of the John Wold Trust for $191,666.67, Thomas Wold, as Trustee of the Thomas Wold's Children's Trust for $191,666.66 and James Wold, Trustee of the James R. Wold Trust for $191,666.66."

The record contains no transcripts of the proceedings; plaintiffs, however, represent on appeal that there was not an evidentiary hearing and the trial court entered a summary judgment in their favor for the full relief requested in Count I.

12

¶ 32        On December 28, 2022, Doris moved to reconsider. Doris argued, *inter alia*, that the trial court did not consider the terms of the Trust document in issuing its money judgment against him. On January 31, 2023, the trial court denied the motion. This appeal followed.[4]

¶ 33                                        II. ANALYSIS

¶ 34        On appeal, Doris challenges the trial court's $575,000 money judgment against him. He argues that the trial court: (1) improperly reversed the burden of proof in summary judgment proceedings; and (2) failed to adequately review the documents on file, particularly the Trust itself. Doris urges that he, a non-professional fiduciary, acted as he believed prudent according to the terms of the Trust.

¶ 35        Plaintiffs agree that the appealed-from money judgment was akin to a summary judgment order, and that no evidentiary hearing took place. They argue that the trial court properly determined that the pleadings, affidavits, and other matters in the record left no doubt that summary judgment was proper as a matter of law. They continue that, once they established that Doris was a fiduciary who engaged in Trust transactions for his own benefit, the burden was on Doris to show by clear and convincing evidence that the transactions that benefited him were done in good faith and were otherwise justified. They further observe that Doris's evidence consisted largely of

---

[4] We note that on March 4, 2022, plaintiffs proceeded in discovery, serving Doris with its first set of interrogatories, 213(f) interrogatories, and request for production. On May 10, 2022, Doris moved to file a partial response to the 213(f) interrogatories. Those proposed responses included that Doris himself, Doris's Harrison Held attorney, and the manager of the Norfolk property (name and phone number provided), would be able to testify to some of Doris's conduct as trustee. Doris attached, *inter alia*, an unsigned and redlined Belcom operating agreement showing Lola to own a 6% interest. The parties did not complete discovery and the trial court never conducted a trial as to the remaining counts, breach of fiduciary duty and removal of the trustee. Instead, the case proceeded to hearing on the Doris's accounting and plaintiffs' objections thereto, as set forth above.

unsigned documents and attorney-fee invoices, neither of which, in their view, are sufficient to overcome their objections.

¶ 36                              A. Summary Judgment and the Instant Hearing

¶ 37        The court should grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). Even if the material facts are undisputed, the court should not grant summary judgment when reasonable persons might draw different inferences from the undisputed facts. *Taliani v. Resurreccion*, 2018 IL App (3d) 160327, ¶ 25. To withstand a summary judgment motion, the nonmoving party need not prove his case at this preliminary stage but must present some factual basis that would support his claim. *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002). We review summary judgment rulings *de novo*. *Id.* at 702.

¶ 38        As noted, plaintiffs agree that the challenged money judgment was entered in a summary judgment proceeding. Plaintiffs do not contend that the nearly 2000-page common law record is incomplete. They do, however, note that Doris neglected to file a report of proceedings such that this court is not privy to the arguments made at hearing and lacks a more complete understanding of the trial court's rationale and ruling.

¶ 39        When an appellate record is incomplete, we resolve all doubts resulting from the incomplete record against the appellant. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984). Also, absent a showing to the contrary, we presume that "the order entered by the trial court was in conformity with law and had a sufficient factual basis." *Id.* Here, as will be explained, a trial court may not hold a fiduciary personally liable for losses to the principal of a trust absent a breach of fiduciary duty by the trustee, and plaintiffs do not argue otherwise. See 760 ILCS 3/1003 (West

14

2020). In keeping with *Foutch*, we presume that the trial court understood this requirement and, in conjunction with its money judgment, determined Doris to have breached his fiduciary duty based on the parties' documentary evidence and written pleadings presented in relation to the accounting motion. Plaintiffs' current position is not that Doris's December 14, 2021, accounting failed to set forth the requisite statutory components of an accounting such as the inventory of the trust estate, and the receipts, disbursements, and distributions. See 760 ILCS 3/813.2(b), (c) (West 2020). Nor do they question where the monies in question came from, what institutions they passed through, how they were disbursed, and on what date. Rather, plaintiffs explain in their appellate brief that their objections were based on their allegation that Doris breached his fiduciary duty in executing each of the challenged transactions. We therefore review the record *de novo* to determine whether plaintiffs were entitled to judgment as a matter of law on the ground that Doris breached his fiduciary duty. See *Taliani*, 2018 IL App (3d) 160327, ¶ 25.

¶ 40                    B. The Applicable Trust Statute and Common Law

¶ 41        The Illinois Trust Code "applies to judicial proceedings concerning trusts commenced before its effective date unless the court finds that the application of a particular provision of [the Trust] Code would substantially interfere with the effective conduct of the judicial proceedings or prejudice the rights of the parties, in which case the particular provision of [the Trust] Code does not apply and the superseded law applies." 760 ILCS 3/1506(4) (West 2020) (enacted by Pub. Act 101-48, § 1505 (eff. Jan. 1, 2020), superseding 760 ILCS 5/1 et seq. (West 2018) (Trust and Trustees Act)). In this case, the Trust Code applies as the record does not establish and the parties do not argue that the trial court found that applying the Trust Code would substantially interfere with the effective conduct of the judicial proceedings or prejudice the parties. See *Grove v. Morton Community Bank*, 2022 IL App (3d) 210177, ¶ 34, n. 4.

15

¶ 42 The Trust Code instructs as to the duty to provide an accounting for trusts created prior to 2020:

> "b) Every trustee at least annually shall furnish to the beneficiaries then entitled to receive or receiving the income from the trust estate, or, if none, then to those beneficiaries eligible to have the benefit of the income from the trust estate, a current account showing the receipts, disbursements, and inventory of the trust estate.

> (c) Every trustee shall on termination of the trust furnish to the beneficiaries then entitled to distribution of the trust estate a final account for the period from the date of the last current account to the date of distribution showing the inventory of the trust estate, the receipts, disbursements, and distributions and shall make available to the beneficiaries copies of prior accounts not previously furnished." 760 ILCS 3/813.2 (b), (c) (West 2020).

Doris does not meaningfully dispute that plaintiffs were entitled to an accounting.

¶ 43 The Trust Code further requires that "the trustee shall administer the trust in good faith, in accordance with its purposes and the terms of the trust, and in accordance with this Code." 760 ILCS 3/801 (West 2020). A trustee has a duty of loyalty to the trust. 760 ILCS 3/802 (West 2020). The "trustee shall administer the trust as a prudent person would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution. 760 ILCS 3/804 (West 2020). In acting as a prudent investor, the trustee may consider without limitation: "(4) the role each investment or course of action plays within the overall portfolio; (5) the expected total return including both income yield and appreciation of capital; (6) the duty to incur only reasonable and appropriate costs; *** (9) needs for liquidity, regularity of income, and preservation or appreciation of capital." 760 ILCS 3/902 (c)(4), (5), (6), (9) (West 2020).

16

¶ 44      A trustee owes a fiduciary duty to the beneficiaries of the trust. *Hill v. Brinkman*, 2023 IL App (3d) 220394, ¶ 17. "A trustee who commits a breach of trust is liable to the beneficiaries affected for the greater of: (1) the amount required to restore the value of the trust property and trust distributions to what they would have been had the breach not occurred; or (2) the value of any benefit received by the trustee by reason of the breach." 760 ILCS 3/1002 (a) (West 2020). Still, it is within the court's equitable powers to issue the relief it deems appropriate. 760 ILCS 3/1001(c) (West 2020) ("Nothing in this Section limits the equitable powers of the court to order other appropriate relief"); see also *Grove*, 2022 IL App (3d) 210177, ¶ 37; *In re Estate of Mathers*, 2022 IL App (3d) 210410, ¶ 15 (the court declined to hold fiduciary personally liable for the failure to collect sales proceeds when the fiduciary had not personally guaranteed the funds and when the fiduciary fee to which he otherwise would have been entitled did not indicate an assumption of personal liability).

¶ 45      A vast array of remedies for a breach remain available to the court and the court may exercise its discretion to:

"(1) compel the trustee to perform the trustee's duties;

(2) enjoin the trustee from committing a breach of trust;

(3) compel the trustee to redress a breach of trust by paying money, restoring property, or other means;

(4) order a trustee to account;

(5) appoint a special fiduciary to take possession of the trust property and administer the trust;

(6) suspend the trustee;

(7) remove the trustee as provided in Section 706;

17

(8) reduce or deny compensation to the trustee; or

(9) \*\*\*, void an act of the trustee, impose a lien or a constructive trust on trust property, or trace trust property wrongfully disposed of and recover the property or its proceeds." 760 ILCS 3/1001(b) (West 2020).

¶ 46    However, "[e]xcept as provided in Section 802 [concerning a breach of loyalty], absent a breach of trust, a trustee is *not* liable to a beneficiary for a loss or depreciation in the value of trust property or for any benefit received by the trustee by reason of the administration of the trust." (Emphasis added.) *Id.* § 1003 (West 2020). Further, "[a] trustee who acts in reasonable reliance on the express language of the trust instrument is not liable to a beneficiary for a breach of trust to the extent the breach resulted from the reliance." *Id.* § 1006 (2020). Correspondingly, a beneficiary may consent to a transaction that a trustee's duty of loyalty would otherwise bar, if the consent was voluntarily given after the full and fair disclosure of the facts. *Grove*, 2022 IL App (3d) 210177, ¶ 41; see also 760 ILCS 3/1009 (West 2020). A presumption of fraud or undue influence may arise if the trustee has benefitted in the transaction from his fiduciary status. *Grove*, 2022 IL App (3d) 210177, ¶ 40. "To rebut the presumption, the trustee must present clear and convincing evidence that [he] exercised good faith and did not betray the beneficiary's confidence." *Id.* ¶ 41.

¶ 47                              C. The Instant Case

¶ 48    Turning to the instant case, it is apparent from the common law record that the trial court did not follow several of the above precepts as to the $250,000 payment to Lola and the $73,187 in attorney fees. As to the $250,000 transaction to Lola, we observe that plaintiffs' implicit position throughout the case has been that Lola is to receive funds from the principal of the Trust only in very limited circumstances. See, *e.g.*, *supra* ¶ 15. To the contrary, the Trust broadly

18

provides that after considering Lola's income and "any other circumstances or factors that the trustee deems pertinent," the principal may be invaded as the trustee "deems advisable" for the beneficiary's "maintenance in reasonable comfort." Courts should not interfere with a trustee's exercise of the discretion given to the trustee by the trust instrument as long as the trustee does not act in a wholly unreasonable and arbitrary manner. *Laubner v. J.P. Morgan Chase Bank*, 386 Ill. App. 3d 457, 464 (2008).

¶ 49 In their January 11, 2022, objection, plaintiffs pled in a single sentence, that "[a]lthough repeatedly requested from Doris, no explanation has ever been provided by Doris to justify the principal distribution of $250,000." This assertion is contradicted by the record. Doris alleged in numerous pleadings that the Norfolk asset did not generate the amount of income he believed E. Thomas to have anticipated for Lola. This relates to the Trust's directive that Doris consider Lola's income before invading the principal. Doris believed distribution from the principal was necessary to keep Lola, the Trust's beneficiary, in "reasonable comfort" and supplement her rising health care needs. Doris attached an email from Lola's son, Richard Parton, discussing the same. He also considered that, even with the $445,000 liquidation ($250,000 of which went to Lola), three-quarters of the Trust's assets remained in reserve for plaintiffs as remainder beneficiaries. Whether the trial court on remand ultimately finds Doris's explanation credible and reasonable, the record refutes that Doris never provided an explanation to plaintiffs for the distribution.

¶ 50 Plaintiffs never pled in their objection, let alone established as a matter of law, that the $250,000 transaction was self-interested such that the burden of proof should shift to Doris. Instead, in their initial complaint, plaintiffs alleged in Count IV that the initial $445,000 liquidation of the Norfolk asset had been part of a conspiracy between Doris and Lola, whereby Doris would

19

receive $174,000 and Lola would receive $250,000. The trial court, however, dismissed that count and plaintiffs never submitted support for a conspiracy linking the two disbursements.

¶ 51    Similarly, plaintiffs do not explain in their appellate brief why they believe the $250,000 transaction constituted a breach of Doris's fiduciary duty other than to state: "[Doris] transferred $250,000 to a co-trustee." However, this argument ignores that Lola received the funds in her capacity as beneficiary and, at least arguably, as permitted by the terms of the Trust. Because plaintiffs have not established that the $250,000 to Lola was a self-interested transaction, they have not established a presumption that Doris breached his fiduciary duty. On remand, the trial court is to consider the $250,000 distribution with the proper burden of proof in mind, as well as the terms of the Trust and Doris's reliance on the same, before determining the propriety of the distribution and whether Doris is personally liable to the extent any portion of the distribution to Lola was improper.

¶ 52    As to the $73,187 in attorney fees, again, plaintiffs identified 12 different payments to 3 different firms made between July 25, 2017, and January 7, 2020. Two firms, The Hays Law Firm and Harrison Held, accounted for nearly $70,000 of those fees. The record does not support plaintiffs' assertion that all of the challenged fees were *incurred* after the close of the estate. Emails and invoices in the record establish that, although the fees were *paid* following the close of the estate, many of them were incurred during the pendency of the estate. For example, the Hays Law Firm accounts for $38,500 of those fees. Email correspondence indicates that it was Lola who hired the Hays Law Firm and most of their work pre-dated her death. Also as established by invoices, some of that work concerned closing out the estate. Later-dated work concerned lingering tax issues with the estate. The invoices also show that the Hays Law Firm billed for advising at which bank to place Trust assets and how to handle distributions, subjects which,

20

although pertaining to the Trust as opposed to the estate, do not necessarily relate to Doris's alleged malfeasance. Similarly, the invoices for Harrison Held establish that some of the $32,000 in fees were incurred for ordinary Trust administration. Indeed, plaintiffs' counsel admitted as much in his December 29, 2019, email: "I cannot agree that *all* the [attorney] fees paid by Errol from the trust are appropriate." (Emphasis added.) Further, a January 23, 2021, email between counsel links many of the Harrison Held fees to ordinary Trust administration.

¶ 53 Accepting for the purpose of argument that Doris should be held personally liable for *some* attorney fees, it appears that trial court exercised no discretion in determining which of the attorney fees related to Doris's alleged malfeasance for which he would be properly liable. The court simply accepted, wholesale, plaintiffs' complete request for damages. "When a court is required by law to exercise its discretion, the failure to do so may itself constitute an abuse of discretion." *Seymour v. Collins*, 2015 IL 118432, ¶ 50. Plaintiffs' argument that the court did not abuse its discretion because it had previously denied Harrison Held's petition for *additional* attorney fees on the basis that the fees were incurred defending Doris's malfeasance misses the point. The abuse of discretion here concerns previously paid fees unrelated to any alleged malfeasance.

¶ 54 We do, however, agree with the trial court's assessment of the $174,000 and $62,000 transactions. These were, on their face, self-interested transactions creating a presumption of breach. See *Grove*, 2022 IL App (3d) 210177, ¶ 40.

¶ 55 Doris has argued that the $174,000 was sanctioned by Lola and represented the partial satisfaction of a personal loan from Doris to E. Thomas and/or Lola. *Id.*; see also 760 ILCS 3/1009 (West 2020). Documentation on file supports the same. See *supra* ¶ 19. Accepting this as true, however, it remains that E. Thomas and/or Lola personally, and not the Trust, owed Doris a debt. Even a liberal reading of the Trust's directive that the trustee may access the Trust principal for

Lola's "health and support and maintenance in reasonable comfort" does not support Doris's use of the Trust principal to pay Lola's personal debt to himself (and then to Belcom). Moreover, paragraph 12, section 11 arguably precludes the transaction. That section provides that no trustee shall have discretion to determine the propriety or amount of payments to himself or to any person to whom he is legally obligated. A plain reading instructs that Doris cannot exercise his discretion to pay himself, nor can Lola, as co-trustee, do it for him because she cannot exercise her discretion to pay a person to whom she is legally obligated.

¶ 56 Doris has also argued that the $62,000 investment in Belcom was permitted by the terms of the Trust. See 760 ILCS 3/1006 (West 2020). Doris notes that paragraph 12, section 7 of the Trust authorizes the trustee to invest in the "family business interests" including Belcom. Doris pled that, due to the $62,000 investment, the Trust owned a 6% interest in Belcom and that, should plaintiffs choose, that interest could be liquidated and returned to plaintiffs at a later date. However, documentation provided by Doris shows that Lola, not the Trust, owned a 6% investment in Belcom. See *supra* ¶ 30, n.4. Even if the investment in Belcom had been properly assigned to the Trust, paragraph 12, section 11 concerning conflicts of interest suggests that Doris should not have participated in determining the propriety or amount to invest in his own company and, instead, Lola was the co-trustee to determine the propriety and amount to invest.

¶ 57 In sum, we affirm the trial court's order as to the challenged transactions that were self-interested on their face—the $174,000 and $62,600 transactions. Given Doris's self-interest, the presumption is that Doris breached his fiduciary duty. We agree with the trial court that Doris did not put forth sufficient evidence to create even a question of fact that these transactions were proper. Accepting as true Doris's explanation for these transactions, they still conflicted with the terms of the Trust. The trial court properly entered a judgment against Doris for those transactions,

22

effectively ordering the return of funds that should not have been disbursed in the first place. The trial court erred, however, in applying this same presumption to the $250,000 and $73,187 transactions and in holding Doris personally liable for the entire sum without further consideration of the parties' evidence. Plaintiffs failed to establish as a matter of law that the $250,000 and $73,187 transactions were self-interested and thus the court erred in placing the burden of proof on Doris to show that he did *not* breach his fiduciary duty. And, contrary to the trial court's written order, the record contains evidence including emails and attorney fee invoices, that at least a portion of those disbursements may have been proper under the terms of the Trust and the Trust Code. Indeed, as to the attorney fees, plaintiffs' counsel all but acknowledged this in email correspondence contained in the record. Genuine issues of material fact thus precluded the court's ruling on the pleadings as to the $250,000 and $73,187 transactions.

¶ 58    Thus, we remand for further proceedings on the $250,000 and $73,187 transactions. If the trial court determines that the disbursements were improper in whole or in part, the trial court must exercise its discretion in fashioning a remedy.

¶ 59    We also remand for the trial court to address the trustee fees to determine whether, in light of our partial reversal and remand, Doris is entitled to *any* of the $15,000 in trustee fees. Upon finding a breach of fiduciary duty, the court may reduce or deny trustee fees. 760 ILCS 3/1001(b) (West 2020). The timing and willfulness of the breach are factors to consider. See *Mathers*, 2022 IL App (3d) 210410, ¶ 18 (a willful and deliberate breach requires the forfeiture of compensation during the period of the breach). We express no opinion as to the outcome on the issue of trustee fees.

¶ 60                                    III. CONCLUSION

¶ 61    The judgment of the circuit court of Du Page County is affirmed in part, reversed in part, and remanded for proceedings consistent with this disposition.

¶ 62    Affirmed in part; reversed in part and remanded.